IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REGINALD B. DeJOHNETTE, ) | No. C 08-4844 MMC (PR) |
| ) | |
| Plaintiff, ) | **ORDER GRANTING DEFENDANTS'** |
| ) | **MOTION TO DISMISS** |
| v. ) | |
| ) | **(Docket No. 30)** |
| SUSAN HUBBARD, et al., ) | |
| ) | |
| Defendants. ) | |
| _____) | |

     On October 22, 2008, plaintiff, a California prisoner incarcerated at Salinas Valley State Prison ("SVSP") and proceeding pro se, filed the above-titled civil rights action under 42 U.S.C. § 1983. Now pending before the Court is defendants' motion to dismiss the complaint pursuant to the unenumerated portion of Rule 12(b) of the Federal Rules of Civil Procedure, on the ground plaintiff failed to exhaust administrative remedies, or, alternatively, pursuant to Rule 12(b)(6), on the ground plaintiff has failed to state a claim upon which relief may be granted. Plaintiff has filed opposition to the motion and defendants have filed a reply.

**BACKGROUND**

     Plaintiff claims that medical practitioners at SVSP failed to properly treat his Hepatitis C. At the outset, plaintiff states that in his complaint he has only summarized the facts relevant to his claims; he asks the Court to treat as his official statement of claims a fifteen-

page attachment to an administrative grievance he filed at the Director's level of review on October 3, 2007. (Compl. at 3:18-24, 3C:1-4; 4J:6-10.) In the attachment, plaintiff makes the following allegations of inadequate care:[1]

From 2001 through 2003, prison officials at SVSP hid from plaintiff the fact that plaintiff was infected with a severe case of Hepatitis C. (Attachment ¶ 2.) Plaintiff discovered his Hepatitis C status when he requested a review of his medical file in 2003. (Id. ¶ 3.) It then took more than two years, specifically, until April 2006, for plaintiff to receive a liver biopsy to determine plaintiff's eligibility for anti-viral treatment for Hepatitis C. **(Id.)** Thereafter, plaintiff had to wait almost another year, until March 2007, to begin receiving treatment, because necessary forms were missing from his medical file. **(Id. ¶ 4.)**

On April 1, 2007,[2] plaintiff first reported to defendant Nurse Ketner[3] that he "wasn't in agreement" with the high blood pressure medication being prescribed by defendant Dr. Milner. (Id. ¶ 7.) Nurse Ketner informed plaintiff that she would make an appointment for him to see Dr. Milner, but by May 1 she still had not done so. (Id. ¶¶ 7-10.) Plaintiff complains that because of his failure to see Dr. Milner for follow-up appointments during the first three months of his Hepatitis C treatment, he began to receive inappropriate treatment. (Id. ¶ 12.) Specifically, on May 11, defendant Nurse Andrea Mobley improperly injected plaintiff with Interferon, spilling most of the medication on his pants, and later that day defendant Nurse Maxwell injected plaintiff a second time with the estimated amount that had been spilled. (Id. ¶ 14.)

On May 15, plaintiff finally saw Dr. Milner, at which time plaintiff complained of the manner in which he was being given his shots, informed Dr. Milner he was developing a rash

---

[1] For the sake of consistency in references to such attachment, the Court cites to the copy submitted by defendants in support of their motion to dismiss. (See Decl. N. Grannis Supp. Mot. Dismiss ("Grannis Decl.") Ex. A "Attachment" signed by plaintiff on Feb. 6, 2008.)

[2] All further references to dates in this section are to 2007, unless otherwise noted.

[3] Although plaintiff identifies this defendant as "Nurse Ketnor," defendants' counsel has clarified that the correct spelling of such individual's name is "Ketner."

on the area of his stomach where the shots were being injected, and complained that he had not received his morning dose of Ribavirin because his prescription had not been filled. Dr. Milner ordered a blood draw. (Id. ¶ 15.)

Three days later, Nurse Maxwell improperly injected plaintiff with only one-half of the medication that was in the syringe. An hour or so later, Nurse Maxwell gave plaintiff another full injection, resulting in plaintiff's receiving one and one-half doses of medication. (Id. ¶ 16.)

On May 30, plaintiff met with defendant Dr. Sid, who reviewed the results from the blood tests that Dr. Milner had ordered on May 15. Dr. Sid told plaintiff he was responding to the treatment because his Hepatitis C viral load had dropped from 2 million to 700,000. Dr. Sid did not tell plaintiff that plaintiff's blood count also was decreasing, nor did he address plaintiff's complaint about his rash. (Id. ¶ 17.)

On June 13, plaintiff again saw Dr. Milner, at which time Dr. Milner ordered another blood test for plaintiff. When plaintiff asked Dr. Milner about the results from the May 15 blood tests, Dr. Milner stated that he couldn't find the results. (Id. ¶ 18.)

During the above visits, plaintiff recalls reporting to Dr. Milner and the nurses that he was having troubling breathing, his "wind" was short, he was weak, and he was having dizzy spells. Rather than address plaintiff's concerns, the nurses told plaintiff that he was experiencing side effects from the Interferon. Additionally, on June 23, defendant Nurse Watson took plaintiff's vital signs, but failed to address his concern that something was seriously wrong with him. (Id. ¶ 19.)

On June 25, plaintiff began bleeding from his mouth. He was taken to the Correctional Treatment Center, where Dr. Nguyen reviewed plaintiff's blood test results and returned plaintiff to his cell, even though, accordingly to plaintiff, the blood test results necessarily would have shown that his blood count had dropped precipitously. (Id. ¶ 20.)

The next day, plaintiff saw Dr. Milner, who ordered an immediate blood draw. Upon reviewing the results, Milner informed plaintiff that he wasn't responding to the Interferon treatment and therefore the treatment would be terminated. Dr. Milner did not tell plaintiff

1  anything else about the complications plaintiff was experiencing.  An ambulance was called
2  and plaintiff was transported to Natividad Hospital for a blood transfusion.  (Id. ¶ 21)

3  When plaintiff was released from the hospital two days later, Nurse Maxwell
4  attempted to inject plaintiff with Interferon, even though the hospital had put a hold on
5  further Interferon treatment for plaintiff.  Later that day, Maxwell improperly discontinued
6  all of plaintiff's medications, including his psychiatric and blood pressure medications.  (Id.
7  ¶¶ 24-25.)

8  For the next seven days, SVSP nurses and Dr. Sid refused to provide plaintiff with any
9  type of medical care.  On July 5, in response to plaintiff's complaint that he was seriously ill,
10 defendant Nurse Norton took plaintiff's temperature, which read 100 degrees, but did nothing
11 to help plaintiff.  Later that evening, Norton again took plaintiff's temperature, which by then
12 read 102 degrees.  Plaintiff was ordered hospitalized.  At the hospital, he was given another
13 blood transfusion because of his low blood cell count.  (Id. ¶ 27.)

14 Plaintiff was released from the hospital on July 11 and began taking the medication he
15 had been prescribed by the hospital; by July 17 he had become "an able bodied person
16 again."  (Id. ¶ 29.)  On July 18 and 19, Nurses Maxwell and Ketner gave plaintiff syringes
17 with Procrit for plaintiff to inject himself with, as prescribed by the hospital  (Id. ¶ 30.)
18 Although plaintiff's "intuition" told him not to take the shots, he did so.  The next day he
19 started to feel seriously ill again.  (Id. ¶¶ 33-34.)

20 On July 27, seven days after injecting himself with the "two mysterious shots" from
21 Nurses Maxwell and Ketner, plaintiff was again hospitalized, this time until August 21.  (Id.
22 ¶ 36.)  Upon plaintiff's return to SVSP the next day, Dr. Sid filled plaintiff's prescription as
23 ordered by the hospital, but failed to order a complete blood count ("CBC"), as directed by
24 the hospital to be done on a weekly basis.  Thereafter, Dr. Sid ordered a CBC every visit, but
25 did not review any of the results with plaintiff until October 29.  (Id. ¶ 39.)

26 Two days after plaintiff's return from the hospital, Nurse Mobley tried to get plaintiff
27 to give himself a Procrit injection, but plaintiff was concerned that the injection did not
28 contain Procrit because of his prior experience with the injections given to him by Nurses

4

1  Ketner and Maxwell.  Plaintiff agreed to take the injections only if given to him by the third
2  watch nurses.  (Id. ¶¶ 40-41.)

3        On September 12, plaintiff went to see an outside blood specialist, Dr. Geetha.
4  Plaintiff's CBC results were not sent with him to the appointment.  When Dr. Sid conducted
5  a follow-up to that visit on September 17, he terminated the Procrit and Prednisone
6  medications that had been prescribed for plaintiff by Dr. Geetha.  (Id. ¶ 44.)  When plaintiff
7  made a second appointment with Dr. Geetha on November 11, SVSP medical staff refused to
8  provide Dr. Geetha with plaintiff's lab results.  (Id. ¶ 47.)

9        On December 14, plaintiff had a teleconference appointment with a liver specialist;
10 the specialist, however, had not been provided with plaintiff's lab results in time for the
11 consultation.  (Id. ¶ 46.)

12       Based on the above events, plaintiff alleges, as set forth in the attachment to his
13 Director's level grievance, that SVSP medical staff intentionally failed to properly care for
14 him when: (1) prior to plaintiff's first hospitalization, he was not treated with appropriate
15 doses of medication, his blood results were not properly monitored or available for review,
16 and his Interferon treatment was improperly terminated; (2) after plaintiff returned from the
17 hospital in June 2007, all of his prescriptions were improperly cancelled and he was not
18 provided with any medical care, causing him to be hospitalized a second time; (3) after
19 plaintiff's return from his second hospitalization he was improperly provided with
20 medication that made him ill and required him to be hospitalized a third time; and (4) after
21 plaintiff's return from his third hospitalization, he was not properly monitored because a
22 CBC test was not ordered on one occasion, the results of his subsequent weekly CBC tests
23 were not timely reviewed with him, and outside blood and liver specialists did not have
24 plaintiff's blood results when they consulted with him.

25       By the instant complaint, plaintiff asserts that the above actions by SVSP medical
26 practitioners amount to deliberate indifference to his serious medical needs.  The named
27 defendants alleged to have improperly treated plaintiff during the relevant time period are
28 Drs. Charles Lee, Carl Millner, and Randy Sid; nurses "Ms./Mrs." Watson, Sheri Ketner,

Andrea Mobley, Sue Norton, Frances Maxwell, and psychiatric technician Andrea Guyot.

**DISCUSSION**

A. <u>Motion to Dismiss for Failure to Exhaust Administrative Remedies</u>

Defendants move to dismiss plaintiff's claims on the ground plaintiff has failed to exhaust his administrative remedies, as is required under 42 U.S.C. § 1997(e).

    1. <u>Legal Standard</u>

Non-exhaustion under § 1997e(a) is an affirmative defense; defendants have the burden of raising and proving the absence of exhaustion. <u>Wyatt v. Terhune</u>, 315 F.3d 1108, 1119 (9th Cir. 2003). A nonexhaustion defense should be raised in an unenumerated Rule 12(b) motion. <u>Id.</u> In deciding such a motion, the district court may look beyond the pleadings and decide disputed issues of fact. <u>Id.</u> at 1119-20. If the court concludes the prisoner has not exhausted nonjudicial remedies, the proper remedy is dismissal of the complaint without prejudice. <u>Id.</u> at 1120.

    2. <u>The Exhaustion Requirement</u>

The Prison Litigation Reform Act of 1995, Pub. L. No. 104-134, 110 Stat. 1321 (1996) ("PLRA") provides: "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory and not left to the discretion of the district court. <u>Woodford v. Ngo</u>, 548 U.S. 81, 84 (2006). "Exhaustion gives an agency an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of [the agency's] procedures." <u>Id.</u> at 89 (internal citation omitted).

Section 1997e(a) requires a prisoner-plaintiff to present his claims to each level of administrative review before raising the claims in a 42 U.S.C. § 1983 action in federal court. <u>See id.</u> at 88. The exhaustion requirement cannot be satisfied by the filing of an untimely or otherwise procedurally defective administrative grievance or appeal. <u>Id.</u> at 84. Rather, "proper exhaustion" of available administrative remedies is required. <u>Id.</u> at 92. The

1  requirements of the prison's grievance process, not the PLRA, define the boundaries of
2  proper exhaustion.  Jones v. Bock, 549 U.S. 199, 218 (2007).

3        The State of California provides its prisoners and parolees the right to appeal
4  administratively "any departmental decision, action, condition or policy perceived by those
5  individuals as adversely affecting their welfare."  Cal. Code Regs. tit. 15, ("CCR"),
6  § 3084.1(a).[4]  In order to exhaust available administrative remedies within this system, a
7  prisoner must proceed through several levels of appeal: (1) informal review, (2) first formal
8  level appeal on a CDC 602 inmate appeal form, (3) second formal level appeal to the
9  institution head or designee, and (4) third formal level appeal to the Director of the California
10 Department of Corrections and Rehabilitation ("CDCR").  See CCR § 3084.5; Barry v.
11 Ratelle, 985 F. Supp. 1235, 1237 (S.D. Cal. 1997).  A final decision from the Director's level
12 of review satisfies the exhaustion requirement under § 1997e(a).  Id. at 1237-38.

13       Where, as in California, a prison's grievance procedures do not set forth the requisite
14 level of factual specificity required in the grievance, "a grievance suffices if it alerts the
15 prison to the nature of the wrong for which redress is sought."  Griffin v. Arpaio, 557 F.3d
16 1117, 1120 (9th Cir. 2009).  The grievance need not include every fact necessary to prove
17 each element of an eventual legal claim.  Id.  As the purpose of grievances, however, is to
18 alert the prison to a problem and facilitate its resolution, the grievance should include
19 sufficient information "to allow prison officials to take appropriate responsive measures."  Id.

20       An action must be dismissed unless the prisoner first exhausted his available
21 administrative remedies before he filed suit.  McKinney v. Carey, 311 F.3d 1198, 1199 (9th
22 Cir. 2002).

23       3.    Exhaustion of Plaintiff's Claims

24       Defendants argue plaintiff did not exhaust his administrative remedies because he did
25 not receive, before filing the instant action, a decision on the merits from the Director's level
26 of review with respect to the claims plaintiff raises herein.

---

[4] Unless otherwise noted, all further references to code sections are to title 15 of the California Code of Regulations.

1    In support of their argument, defendants submit a declaration by N. Grannis
2 ("Grannis"), Chief of the Inmate Appeals Branch ("IAB") at the CDCR. According to
3 Grannis, the IAB keeps an electronic record of each inmate administrative appeal that has
4 proceeded through the final level of review, the Director's level. (Decl. N. Grannis Supp.
5 Mot. Dismiss ("Grannis Decl.") ¶ 4.) Prior to November, 2008, all medical appeals were
6 included in the IAB computer database. (Id. ¶ 5.)[5]

7    Grannis has searched the IAB computerized system and attached to her declaration
8 copies of the only medical appeals plaintiff exhausted through the Director's level of review
9 prior to the date plaintiff filed the instant action. Specifically, Appeal No. SVSP 04-03826
10 was rejected at the Director's level on April 12, 2005, and Appeal No. SVSP 07-04396 was
11 rejected at the Director's level on April 26, 2008. (Id. ¶ 6 & Exs. A, B.)

12    It is not disputed by the parties that plaintiff's first appeal, Appeal No. SVSP 04-
13 03826, concerned plaintiff's request for an extra mattress and did not pertain to the claims
14 raised in the instant action. Consequently, such appeal did not serve to exhaust
15 administrative remedies with respect to any of the instant claims.

16    Additionally, defendants contend that plaintiff's second appeal, Appeal No. SVSP 07-
17 04396, did not serve to exhaust administrative remedies with respect to the instant claims
18 because said appeal was limited to a single issue that is not part of the instant action.
19 Plaintiff, however, maintains that a fifteen-page addendum he filed with his appeal at the
20 Director's level did address the claims herein and, consequently, the claims are exhausted.

21    Accordingly, to determine whether plaintiff has exhausted his administrative
22 remedies, the Court next reviews the substance of the issues raised in Appeal No. SVSP 07-
23 04396 as compared with the claims raised in the instant action.

---

[5] As of November 2008, all medical appeals are received and reviewed at the Office of Third Level Appeals-Health Care. Because plaintiff filed the instant action on October 22, 2008, any relevant medical appeal case information would be included in the IAB computer database. (Id. ¶ 5.)

        a.      <u>SVSP Appeal No. 07-04396</u>[6]

On October 3, 2007, plaintiff submitted inmate Appeal No. 07-04396 for informal level review. (Grannis Decl. Ex. A at 3.) In Section A of the grievance form, in which the prisoner is asked to describe his problem, plaintiff described his grievance as follows:

> This 602 addresses the actions of medical employees working under the C.M.O. [Chief Medical Officer], Dr. Lee because Doctors and/or nurses under Dr. Lee continue to be negligent with respect to the treatment I'm suppose to receive. To explain: I was told by Dr. Sid during a follow-up visit that the blood draws being ordered to check my "complete blood count" were being sent out to Foundation Laboratory in Pomona CA., so that when I attend my follow-up visit with Dr. Varma Geetha, who's a blood specialist in Salinas CA., she'll have an accurate account of what the results are to my overall blood level. The problem is, when I went to go see named Doctor, she didn't have my blood count results, because medical here at the Prison failed to send the results along with the rest of the documents that was given to the transportation officer.
>
> This issue has become a serious problem, because it has happen quite a few times when Doctors were suppose, and/or needed to review my results to determine my diagnosis. For example: named lab results were also missing when I seen Dr. Milner on 6/13/07, and it wasn't long after that I ended up in the hospital, dealing with a condition I'm still suffering from 3 months later.
>
> End of Complaint.

(<u>Id.</u> at 3, 5.)

In Section B of the grievance form, in which the prisoner is asked to describe the action requested, plaintiff stated, "supervising authorities need to instruct medical to refrain from their malpractice, before serious harm is brought to me." (<u>Id.</u> at 3.)

Plaintiff's appeal bypassed the informal level of review. At the first level of formal review plaintiff was interviewed by nurse Ketner at a meeting which Dr. Sid also attended. In partially granting the appeal, Nurse Ketner reported that Dr. Sid presented plaintiff with a list of doctors and lab blood-draw dates, and told plaintiff he would continue to be seen for monitoring and that Dr. Sid would attempt to ensure that all appropriate paperwork accompany plaintiff to his follow-up visits. (<u>Id.</u> at 4.)

On December 18, 2007, plaintiff requested a second level review, asserting he was dissatisfied with the first level response because his appeal should have been reviewed by the

---

[6]The background facts relevant to the exhaustion of Appeal No. 07-04396 are undisputed.

9

CMO, Dr. Lee.  Additionally, plaintiff wrote that the problem of records not being forwarded was continuing, because the liver specialist, during a December 14 teleconference with plaintiff, informed plaintiff that the lab results the specialist required to review plaintiff's file had not been forwarded to such specialist.  (Id. at 8.)

Thereafter, on January 11, 2008, plaintiff's grievance was "partially granted" at the second level by Dr. Lee, who identified plaintiff's grievance issue as the prison's repeated failures to ensure that plaintiff's blood results accompany him to his specialist appointments, one of which failures, according to plaintiff, had resulted in his having to be hospitalized in June 2007.  (Id. at 11.)   As Dr. Lee explained: "Every effort is [being] made, and will continue to be made, to ensure that any laboratory tests, diagnostic tests, and/or specialty consultation reports are available and in the Unit Health Record at the time of any follow-ups for such."  (Id. at 12.)

On February 6, 2008, plaintiff submitted a Director's level appeal.  In response to Section H of the appeal form, which section asks the prisoner to summarize the reasons for requesting Director's level review, plaintiff submitted a fifteen-page attachment.  In the attachment, plaintiff described, as noted above, numerous medical complaints, going back as far as 2003, pertaining to the treatment he had received from SVSP medical practitioners for his Hepatitis C, and focused on the following instances of alleged inadequate medical care in 2007: the issuance of inappropriate prescription drugs for plaintiff's Hepatitis C and other ailments; the improper administration of drugs for plaintiff's Hepatitis C; improper monitoring of plaintiff's blood results, caused by the failure of medical staff on four occasions to forward plaintiff's blood test results to PBSP doctors and outside specialists, and Dr. Milner's failure to draw plaintiff's blood on one occasion and to timely review plaintiff's subsequent blood test results with plaintiff.  (Id. at 13-28.)  Asserting that SVSP medical practitioners were "deliberately" and "intentionally" subjecting him to "life threatening, almost fatal complications," plaintiff requested that he be transferred to a medical facility where he could be properly treated for his Hepatitis C.  (Id. at 28 ¶ 49.)

On April 26, 2008, the appeal was denied at the Director's level by Grannis, who

summarized the appeal issues as follows:

> The appellant states he receives blood draws to check his complete blood count; however, when he went out for his follow-up visit with Dr. Geetha, a blood specialist, the [SVSP] medical staff did not send the results of his blood draws. The appellant states that failing to send the results to the specialist was nearly fatal for him in June 2007, requiring him to be hospitalized. The appellant believes he almost died because of negligence by the medical staff; however, if this is not so, he requests that supervisory authorities instruct the medical department to refrain from their malpractice before serious harm befalls the appellant.

(Ex. A at 1.)

Additionally, after reviewing the first and second level reviewer's decisions, Grannis made the following findings:

> In requesting a Director's Level of Review (DLR) the appellant encloses a 15-page addendum to his appeal, plus a multiple-page "Exhibit A," which catalogs the difficulties he has experienced attaining a diagnosis for his HCV [Hepatitis C], the problems he encountered starting HCV treatment, and continuing problems he experienced when the treatment was terminated. The appellant also requests an immediate transfer to a medical facility for HCV treatment. The appellant has added new issues and requests to his appeal. The additional requested action is not addressed herein as it is not appropriate to expand the appeal beyond the initial problem and initially requested actions (CDC Form 602, Inmate/Parolee Appeal Form, Sections A and B.) The appellant may wish to address these issues in a separate appeal.

(Id.)

As Grannis further explained:

> In reaching a decision at the DLR, it is noted the appellant's initial issue on appeal addressed his assertion that his test results had not been sent with him when he went out to a specialty appointment. He states the medical documents had been given to the transportation officer, but they never arrived at the doctor's office. At the FLR [First Level of Review], it was noted that every attempt will be made to assure that all appropriate paperwork accompanies the patient to assure continuity of care. At the SLR [Second Level of Review], the Health Care Manager (HCM) also affirmed that every effort is made and will continue to be made, to ensure that laboratory tests, diagnostic tests, and any speciality consultation reports are available and are placed in the UHR at the time of any follow-up appointments.

(Id.)

Lastly, Grannis stated:

> The appellant is reminded the California Code of Regulations, Title 15, Section (CCR) 3354, establishes that only qualified medical personnel shall be permitted to diagnose illness and/or other conditions, and prescribe medical treatment for inmates. It is not appropriate to self-diagnose medical problems and expect a physician to implement the appellant's recommendation for a course of medical treatment. After review, there is no compelling evidence that warrants intervention at the DLR, as the appellant is receiving the health care

11

        deemed medically necessary by his PCP, the HCM, and other members of the SVSP medical staff.

(Id.)

    4.     Analysis

In the instant action, plaintiff states that the fifteen-page attachment he filed at the Director's level of review concerns the same claims he is raising herein. In their motion to dismiss, defendants maintain that Appeal No. SVSP 07-04396 did not serve to exhaust all of the claims plaintiff brings against them for deliberate indifference to his serious medical needs because plaintiff did not follow proper administrative grievance procedures in presenting the claims in his prison appeals. As set forth below, the Court finds defendants' argument persuasive.

At the outset, the Court notes that the first two sections of the statewide inmate grievance form, sections A and B, direct the inmate to describe the problem at issue and the action requested. CCR § 3084.2(a); see Woodford v. Ngo, 548 U.S. 82, 84-86 (2006). The purpose of the administrative appeal and, in particular, sections A and B, is to "alert the prison to a problem and facilitate its resolution." Griffin v. Arpaio, 557 F.3d 1117, 1120 (9th Cir. 2009). Initially, in sections A and B of plaintiff's administrative appeal, the crux of the problem described by plaintiff was, as noted above, medical staff's failure, on two occasions, to forward laboratory results of plaintiff's blood tests in advance of plaintiff's medical appointments with Dr. Milner, who was one of plaintiff's doctor's at PBSP, and Dr. Geetha, a blood specialist. Additionally, upon submitting his second level appeal, plaintiff wrote in section F of the grievance form, which section asks the inmate to describe the reasons he is seeking second level review, that the problem was continuing because his blood results had not been received by the liver specialist prior to plaintiff's teleconference consultation with said specialist on December 14. Plaintiff's complaint as stated in the above-noted sections of the grievance form was that because of the failure to forward his blood results he had not received appropriate medical treatment; as relief, plaintiff sought closer supervision of medical staff to avoid repetition of the problem in the future.

After plaintiff's grievances were rejected at the first and second levels of review, plaintiff attempted to expand the parameters of his appeal by adding a fifteen-page attachment to section H of the grievance form, which section requires the prisoner to state the reasons why he is seeking review at the Director's level. Specifically, in addition to plaintiff's claims concerning the unavailability of his blood test results for review by doctors on the three occasions noted above, plaintiff alleged: that he had not been able to obtain his blood results in preparation for a second meeting with the blood specialist in November 2007; that he had been issued inappropriate prescription drugs for his Hepatitis C and other ailments on several occasions in 2007 unrelated to the untimely delivery of lab results; that his Hepatitis C drugs had been improperly administered on several occasions in 2007 unrelated to the untimely delivery of lab results; that Dr. Milner had failed, on one occasion in July 2007, to take a blood draw, and had failed to review plaintiff's subsequent blood test results with him until October 2007. None of the additional claims were raised in the grievance form at the first and second levels of review.

As noted, the exhaustion requirement cannot be satisfied by the filing of a procedurally defective administrative grievance or appeal. Woodford, 548 U.S. at 84. While proper exhaustion does not require a prisoner to include in the grievance every fact necessary to prove each element of an eventual legal claim, the grievance must include sufficient information "to allow prison officials to take appropriate responsive measures." Griffin, 557 F.3d at 1120. See, e.g., Morton v. Hall, 599 F.3d 942, 946 (9th Cir. 2010) (finding grievance complaining of visitation restrictions, with no mention of assault that led to restrictions, insufficient to put prison officials on notice of claim that staff conduct contributed to assault); Griffin, 557 F.3d at 1120 (finding no exhaustion where grievance complaining of upper bunk assignment failed to allege, unlike complaint filed in court, that prison officials disregarded nurse's order for lower bunk assignment); O'Guinn v. Lovelock Correctional Center, 502 F.3d 1056, 1062-63 (9th Cir. 2007) (finding grievance requesting lower bunk due to poor balance resulting from previous brain injury did not exhaust administrative remedies for claims of denial of mental health treatment).

13

Here, plaintiff's initial administrative grievance served only to notify prison officials of the specific concern plaintiff had about his blood test results not accompanying him to important medical appointments, which situation he feared had been, and would continue to be, the cause of his receipt of inadequate medical treatment. Consequently, as noted, prison officials who investigated and responded to the grievance at the first and second levels of review assured plaintiff that every effort would be made to ensure that laboratory tests, diagnostic tests, and any specialty consultation results would be available at the time of any future follow-up appointments.

Because plaintiff did not alert prison officials at the first and second levels of review to the numerous other instances of alleged misconduct presented in his fifteen-page attachment at the Director's level, they were never afforded an opportunity to address those additional concerns. Contrary to plaintiff's assertions, the claims in the fifteen-page attachment are not simply aspects of the inadequate medical treatment about which plaintiff notified prison officials in his first and second level grievances.

As Grannis expressly stated to plaintiff, plaintiff's new claims were not properly presented at the Director's level of review because such claims, raised in the fifteen-page attachment, had not been properly submitted and, consequently, would not be reviewed on the merits at the Director's level. Although plaintiff was advised that he could raise the additional medical issues in a separate grievance, he did not do so before filing the instant action.[7]

In sum, having considered the arguments and evidence submitted by the parties in support of and opposition to the motion to dismiss, the Court finds Appeal No. 07-04396 did not provide SVSP prison officials with sufficient information to put them on notice that in addition to plaintiff's claim that his blood test results were not available for the above-noted visits with Dr. Milner, Dr. Geetha and the liver specialist, plaintiff had numerous other

---

[7] Plaintiff's opposition references and includes inmate grievance forms, appeals screening forms, health care request forms, administrative appeal responses, and other correspondence associated with additional administrative grievances; those appeals, however, all were submitted in 2009 and 2010, well after the instant action was filed.

14

claims of inadequate medical care as contained in the instant complaint. Consequently, the Court concludes that only plaintiff's claim concerning the unavailability of his blood test results on those three occasions was properly presented at the Director's level of review, and that all other claims in the instant action were not exhausted by way of Appeal No. SVSP 07-04396.

Accordingly, defendants' motion to dismiss the instant action as unexhausted will be granted. If plaintiff wishes to proceed with the instant action solely based on his exhausted claims concerning the availability of blood test results, he may file an amended complaint that contains only those claims. If, however, plaintiff wishes to proceed with a complaint that includes all of the claims he has attempted to raise herein, he must file a new and separate action asserting all such claims for relief once administrative remedies have been exhausted with respect thereto. See Lira v. Herrera, 427 F.3d 1164, 1176 (9th Cir. 2005) (holding where prisoner files mixed complaint containing closely related and intertwined exhausted and unexhausted claims, dismissal of defective complaint with leave to amend to allege only fully exhausted claims is proper approach). Plaintiff must inform the Court of his intentions in such regard as set forth in the "Conclusion" section of the instant order.[8]

B.   Unserved Defendant

In its Order of Service filed April 6, 2009, the Court directed the United States Marshal ("Marshal") to serve the eight SVSP medical practitioners against whom the Court found plaintiff had stated cognizable claims for relief. The Marshal successfully served all defendants with the exception of Frances Maxwell ("Maxwell"), identified by plaintiff as a vocational nurse at SVSP. The address provided by plaintiff for said defendant was SVSP. On June 11, 2009, the unexecuted summons was returned to the court with a notation by the Marshal that the summons had been returned to the Marshal by the SVSP Litigation Coordinator for the reason that Maxwell no longer was employed at SVSP, and that an

---

[8] As the motion to dismiss will be granted for failure to exhaust administrative remedies, the Court does not reach defendants' alternative argument that the claims are subject to dismissal for failure to state a claim upon which relief may be granted.

attempt had been made to contact Maxwell at Maxwell's last known address but Maxwell could not be located. (Docket No. 18.)

To date, Maxwell has not been served. It is clear, however, that the claims against Maxwell are subject to dismissal for the reasons discussed above. Specifically, plaintiff alleges that Maxwell failed to provide him with adequate medical care for his Hepatitis C, and there is no suggestion in the complaint and exhibits attached thereto, or in the briefs and exhibits filed in connection with the instant motion to dismiss, that the Court's analysis as to nonexhaustion with respect to the claims against Maxwell would differ in any respect from the Court's analysis with respect to the other defendants. In particular, given the Court's finding that plaintiff has failed to produce, as against the served defendants, evidence sufficient to show he exhausted his administrative remedies in connection with his claims of deliberate indifference concerning matters other than the untimely delivery of his blood test results, plaintiff cannot prevail on such additional claims as against Maxwell. Accordingly, the Court will dismiss the claim against defendant Maxwell as unexhausted. See Abagninin v. AMVAC Chemical Corp., 545 F.3d 733, 742 (9th Cir. 2008) (holding district court properly granted motion for judgment on pleadings as to unserved defendants where such defendants were in position similar to served defendants against whom claim for relief could not be stated); Columbia Steel Fabricators, Inc. v. Ahlstrom Recovery, 44 F.3d 800, 803 (9th Cir. 1995) (affirming grant of summary judgment in favor of nonappearing defendant where plaintiff, in response to summary judgment motion filed by appearing defendant, had "full and fair opportunity to brief and present evidence" on dispositive issue as to claim against nonappearing defendant).

## CONCLUSION

For the foregoing reasons, the Court orders as follows:

1. Defendants' motion to dismiss is hereby GRANTED.

2. Within thirty days of the date this order is filed, plaintiff shall either (1) file an amended complaint containing only his exhausted blood test result claims, or (2) inform the Court that he intends to proceed with all claims in a new and separate action once all of his

1  claims have been exhausted.  If plaintiff chooses the latter option, the instant action will be
2  dismissed without prejudice.
3        Plaintiff's failure to comply with this order will result in the dismissal of the instant
4  action without prejudice.
5        This order terminates Docket No. 30.
6        IT IS SO ORDERED.
7  DATED: September 30, 2010
8                          MAXINE M. CHESNEY
                        United States District Judge